■ In the Matter of NEW CINGULAR WIRELESS PCS, LLC, Petitioner, v TAX APPEALS TRIBUNAL OF THE STATE OF NEW YORK et al., Respondents. [59 NYS3d 846]—

Egan Jr., J. Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Tax Law § 2016) to review, among other things, a determination of respondent Tax Appeals Tribunal denying petitioner's request for certain refunds of sales and use tax imposed under Tax Law articles 28 and 29.

Petitioner is a limited liability company that, among other things, provides Internet access services to its customers nationwide. Between November 2005 and September 2010, petitioner erroneously billed and collected sales tax from its customers for such services, and those taxes, in turn, were remitted to the Department of Taxation and Finance. In 2009, 54 separate class action lawsuits were filed on behalf of

petitioner's customers in 44 states, alleging that petitioner improperly had charged them taxes for Internet access service, and those actions subsequently were consolidated in the United States District Court for the Northern District of Illinois. Thereafter, in June 2011, the federal court approved a global settlement agreement between petitioner and a national settlement class with state-specific subclasses, including a New York subclass, consisting of current and former customers who had paid taxes for Internet access service during the period at issue.

For taxing jurisdictions like New York, the settlement agreement required petitioner to file a refund claim on behalf of its impacted customers—subject to each individual state's own laws relative to refunds or refund procedures (*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F Supp 2d 935, 983 [ND Ill 2011]). By the express terms of the settlement agreement, each settlement class member consented to (1) petitioner filing a claim for refund of the Internet access taxes erroneously collected, (2) payment of the refund by the taxing authority to petitioner or directly to the court's escrow account, and (3) the distribution of the net settlement funds to the customers by the escrow agent under the supervision of the court. Consistent with the terms of the settlement agreement, petitioner assigned all of its rights, title and interest in any refund it received to the settlement class customers. To the extent that a specific taxing authority required petitioner to refund the erroneously collected taxes to the affected customers prior to such authority granting or paying a refund claim, the settlement agreement provided that the payment by petitioner of a sum representing such taxes into a pre-refund escrow account would constitute repayment thereof.[1]

In November 2010, petitioner submitted a claim for a refund of sales tax or credit. Petitioner twice modified the amount of its claim—ultimately seeking a refund of approximately $106 million. There is no dispute that, as of the point in time that petitioner submitted its claim for a refund, petitioner had not funded any escrow account, including the pre-refund escrow account referenced in the settlement agreement.[2] Thereafter, in August 2012, the Division of Taxation denied petitioner's

---

1. The settlement agreement also established a detailed and specific methodology to ensure that any refund received by petitioner was passed along to its affected customers. As the intricacies of the refund methodology are not at issue here, the precise manner in which petitioner's customers would be made whole need not be discussed.

2. According to petitioner, it did not fund the pre-refund escrow account because the Division of Taxation indicated that it would not consider the

refund claim, finding that petitioner had failed to reimburse its customers for the sales tax collected and, further, that the supporting documentation tendered by petitioner was insufficient to permit the Division "to determine how the refund amounts shown for each customer were determined."

Following the Division's denial of petitioner's refund claim, petitioner and the settlement class entered into a "clarifying" agreement dated September 9, 2013, which provided, in relevant part, that any payments made by petitioner to either the New York escrow account or the pre-refund escrow account would be considered as payments made to the settlement class, that the funds so deposited would be used to make refunds and, further, that such funds would be considered as refunds to the settlement class at the moment they were deposited into such accounts. Consistent with the terms of the clarifying agreement, petitioner was prepared to make the required deposit if the Division would concede that such deposit would satisfy the requirements of Tax Law § 1139 (a).

In October 2012, petitioner filed a petition contesting the denial of its refund claim. The Division moved for summary determination contending, among other things, that petitioner was not entitled to the requested refund due to its failure to refund the erroneously collected taxes to its customers. Petitioner opposed the Division's motion and cross-moved for partial summary determination. By determination dated July 17, 2014, an Administrative Law Judge (hereinafter ALJ) granted the Division's motion, finding, among other things, that the plain language of Tax Law § 1139 (a) and 20 NYCRR 534.2 required petitioner to repay the erroneously collected taxes to its customers before it could apply for a refund. Petitioner thereafter sought to reopen the record pursuant to 20 NYCRR 3000.16, which vests an ALJ with discretion to reopen the record based upon, among other things, newly discovered evidence. Petitioner's motion was supported by an affidavit indicating that, as of August 14, 2014, petitioner—in accordance with the terms of the global settlement agreement—had entered into an escrow agreement and funded a pre-refund escrow account in the amount of $106,038,598.59. By order dated December 4, 2014, the ALJ denied petitioner's

funding of such account as satisfying the requirements of Tax Law § 1139 (a) relative to the repayment of the taxes collected to the affected customers. In other words, while the funding of the pre-refund escrow account would, under the terms of the settlement agreement, constitute a repayment of taxes erroneously collected, the Division would not consider the funding of a such an account to constitute a repayment of taxes under Tax Law § 1139 (a).

motion, finding that the subject affidavit did not constitute newly discovered evidence.

Petitioner filed exceptions to both the ALJ's July 2014 decision in favor of the Division and the denial of its motion to reopen the record. Respondent Tax Appeals Tribunal heard oral argument in this matter in August 2015 and, in February 2016, affirmed the ALJ's July 2014 decision and upheld the denial of petitioner's motion to reopen the record.[3] Petitioner then commenced this CPLR article 78 proceeding to challenge the Tribunal's determination.

With respect to petitioner's application to reopen the record, the parties debate whether the affidavit attesting to the funding of the pre-refund escrow account in August 2014 constitutes newly discovered evidence or newly created evidence and, as to the merits of petitioner's refund application, argue over, among other things, whether petitioner had to repay its customers before seeking a refund from the Division. However, in their zeal to advance their competing interpretations of Tax Law § 1139 (a) and the corresponding regulations, the parties appear to have lost sight of one salient fact—namely, that petitioner's customers are owed in excess of $106 million— moneys that were erroneously collected by petitioner in the form of taxes over a five-year period, moneys that now—some 7 to 12 years later—are being held by the Division and moneys that, quite simply, neither petitioner nor the Division are entitled to retain.

Regardless of the interpretation ultimately to be accorded to Tax Law § 1139 (a), there is no question that the ALJ properly denied petitioner's refund claim in July 2014 because, as of that point in time, petitioner admittedly had made no effort to repay—in any way, shape or form—the $106 million due and owing to its customers. Petitioner had not directly remitted such funds to its customers out of its own pocket, nor had it— consistent with the terms of the global settlement agreement— funded any escrow account for that purpose. Whatever petitioner's underlying rationale for proceeding in this fashion may have been, the fact remains that petitioner had not "repaid" the erroneously collected taxes—as of July 2014—in *any* sense of the word.

---

3. The Tribunal upheld the denial of petitioner's refund claim because petitioner had not made any attempt to repay its customers prior to seeking the requested refund. Because the Tribunal also upheld the ALJ's denial of petitioner's motion to reopen the record, the Tribunal did not reach and, hence, did not address the issue of whether petitioner's subsequent funding of the pre-refund escrow account would constitute repayment within the meaning of Tax Law § 1139 (a).

As the ALJ aptly noted, however, the procedural landscape changed in August 2014 when petitioner funded a pre-refund escrow account in an amount exceeding $106 million. Although the ALJ refused to grant petitioner's subsequent motion to re-open the record upon this ground and respondents have effectively viewed petitioner's funding of the pre-refund escrow account as too little, too late, we are not prepared to ignore the fact that the funds in question, which amount to over $106 million and are undeniably due and owing to petitioner's customers, are now available and are awaiting distribution—if only petitioner and the Division could get out of each other's way long enough to make that happen. Based upon the particular facts of this case, and in the absence of a viable alternative,[4] we find that it was as abuse of discretion to deny petitioner's motion to reopen the record. Accordingly, petitioner's motion to reopen is granted, and this matter is remitted for further proceedings.

As noted previously, having upheld the denial of petitioner's motion to reopen the record, the Tribunal never reached the overarching question of whether petitioner's funding of the pre-refund escrow account in compliance with the terms of the global settlement agreement and the ensuing clarifying agreement indeed would constitute repayment of the improperly collected taxes within the meaning of Tax Law § 1139 (a). While resolution of that issue awaits further administrative proceedings, we acknowledge that the Division—consistent with the terms of the statute and its accompanying regulations—indeed may adopt a mechanism and process for evaluating and resolving refund claims such as the one advanced by petitioner. To our thinking, however, it would be inconsistent with both the

---

4. At oral argument, counsel for respondent Commissioner of Taxation and Finance took the position that, as a remedy for the denial of petitioner's refund claim and/or motion to reopen the record, petitioner could simply file a new refund claim and rely upon the fact that the pre-refund escrow account now had been funded. Counsel also was quick to point out, however, that any such application would be subject to whatever defenses the Division might wish to assert. Although counsel did not elaborate, it appears from a review of the pertinent regulations that a subsequent refund claim would be subject to a statute of limitations defense. If the Division were to assert such a defense and, further, were to prevail, the net effect would be a $106 million windfall to the Division—a result that the statutory scheme surely did not envision. Additionally, even assuming that a subsequent refund application proved to be successful, starting the administrative process all over again from square one would only serve to further delay the required refund to petitioner's customers. Hence, in the interest of expediting the return of the erroneously collected taxes to petitioner's customers, it strikes us as appropriate to grant petitioner's motion to reopen and proceed accordingly.

statutory purpose and the underlying public policy considerations, i.e., avoiding unjust enrichment and ensuring that petitioner's customers are in fact made whole, for that process to be implemented in a manner that resulted in either a windfall to the Division or further (and unnecessary) delay in tendering the long overdue refund to which petitioner's 2,100,027 customers are entitled. Pursuant to the terms of the global settlement agreement, petitioner has unquestionably assigned all rights, title and interest in the subject refund to the settlement class customers, and those customers, in turn, have effectively consented to accept whatever refund they may be able to achieve. Notably, petitioner's customers already have acknowledged that the funding of the pre-refund escrow account constitutes repayment of the taxes erroneously collected, the federal court has judicially sanctioned the underlying settlement and, more to the point, the court has retained supervision over the implementation and distribution of the refund to petitioner's customers. To our analysis, all that remains is the physical act of distributing the subject funds, i.e., tendering to petitioner's customers the moneys to which they are due and owing and remitting to petitioner whatever refund to which it may be entitled, and the parties would be well-served to proceed in a fashion that accomplishes those tasks in as expeditious a manner as possible.

Garry, J.P., Lynch, Clark and Aarons, JJ., concur. Adjudged that the determination is modified, without costs, by annulling so much thereof as denied petitioner's motion to reopen the record; said motion granted and matter remitted to respondent Commissioner of Taxation and Finance for further proceedings not inconsistent with this Court's decision; and, as so modified, confirmed.